UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BARBARA E. SALAMON, M.D.,                                99-CV-0048E(Sr)

                              Plaintiff,

             -vs-                                        MEMORANDUM

OUR LADY OF VICTORY HOSPITAL,                                   and
MICHAEL C. MOORE, M.D.,
FRANKLIN ZEPLOWITZ, M.D.,                                   ORDER[1]
JOHN F. REILLY, M.D.,
ALBERT J. DIAZ-ORDAZ, M.D. and
JOHN P. DAVANZO,

                              Defendants.

---

        Plaintiff commenced this action on January 21, 1999 against defendants Our

Lady of Victory Hospital ("OLV") and five medical personnel associated therewith —

*viz.*, Dr. Michael C. Moore, Dr. Franklin Zeplowitz, Dr. John F. Reilly, Dr. Albert J.

Diaz-Ordaz and John P. Davanzo (collectively "Administration").[2]   Plaintiff alleges

that defendants violated  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et*

*seq.* ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law §290

---

        [1]This decision may be cited in whole or in any part.

        [2]At all times relevant to this case, Moore was the Chief of OLV's Gastroenterology
Division, Zeplowitz was OLV's Chief of Staff, Vice President of Medical Affairs, Chairman of the
Medical Executive Committee and the Chief of OLV's Credentials, Quality Assurance and By-
Laws Committees, Reilly was OLV's Chief of Medicine and a member of OLV's Medical
Executive Committee, Diaz-Ordaz was a member of OLV's Quality Assurance Committee and
Davanzo was OLV's President/Chief Executive Officer.

*et seq.* ("NYHRL"),[3] by subjecting her to sexual harassment and discrimination and

by conspiring to negatively impact her future employment opportunities and violated

New York State common law by tortiously interfering with her business relations.

Defendants[4] moved to dismiss plaintiff's March 5, 1999 Amended Complaint on April

1, 1999, which the undersigned granted in part and denied in part on October 5, 1999

("October 5 Order").[5]   Subsequently, on February 12, 2001, defendants moved for

summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure

("FRCvP").   On March 5, 2001, plaintiff filed an FRCvP 56(f) motion seeking to stay

defendants' motion for summary judgment pending the completion of discovery,

---

[3]Plaintiff's Title VII and NYHRL claims will be analyzed together because the Second Circuit applies federal standards of proof to discrimination claims brought under the NYHRL. *Mandell* v. *County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *Torres* v. *Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997) (finding that claims under the NYHRL are analytically inseparable from Title VII claims).

[4]Defendants OLV, Zeplowitz and Davanzo — represented by the same counsel — submitted the memorandum of law in support of the motion to dismiss, in which memorandum and motion the remaining defendants — each represented by their own counsel — joined.  The pending motions for summary judgment were submitted in the same manner — *viz.*, the six defendants submitted one memorandum of law in support and one reply memorandum in further support of their motions for summary judgment.  As such, the Court will refer to the four motions for summary judgment as if they were a single motion for summary judgment.

[5]Plaintiff's Amended Complaint asserts eight causes of action, the first five of which the undersigned dismissed in the October 5 Order.  Plaintiff's first four causes of action were brought under antitrust laws and were dismissed because plaintiff could, at most, allege an injury to herself and her fifth cause of action under Title VI, 42 U.S.C. §§2000d-2000d-7, was dismissed because it was insufficiently pled. (October 5 Order, at 8-9.) Defendants also sought to have plaintiff's Title VII and NYHRL claims dismissed, but the undersigned denied such while warning plaintiff "that a future showing merely of a minuscule degree of hospital control over some aspect of the plaintiff's professional practice may well be insufficient to overcome the heavier evidentiary burdens the plaintiff will bear as this case progresses." (*Id.* at 13 (citation omitted).)

which the undersigned initially denied on May 24, 2001 and then granted on February 13, 2002 upon plaintiff's June 13, 2001 motion for reconsideration. Defendants refiled their motion for summary judgment on March 28, 2003, which motion plaintiff again, on June 6, 2003, sought to stay pending the completion of discovery.   The undersigned granted plaintiff's second request for a stay on November 7, 2003.   Defendants, for the third and final time, filed their motion for summary judgment on February 27, 2004, which was argued and submitted on July 30, 2004.   For the reasons set forth below, defendants' motion will be granted and plaintiff's claims will be dismissed.

Plaintiff claims that defendants (1) engaged in sexual harassment and discrimination, resulting in substantial damage to her reputation, practice and career, in violation of Title VII and the NYHRL and (2) acted with malice in initiating and conducting peer review and disciplinary proceedings eliminating her existing and prospective patient referral sources.   In moving for summary judgment, defendants claim, *inter alia*, that plaintiff, as a matter of law, is not an "employee" of OLV for purposes of Title VII and, as such, has no cognizable Title VII or NYHRL claim.[6]   In response, plaintiff claims that she is an employee and, in the alternative, if she is found not to be OLV's employee, that defendants are still liable under Title VII for interfering with her future employment opportunities.   The Court will find that

---

[6]Defendants make a series of arguments addressing plaintiff's substantive Title VII and NYHRL claims.   As the Court will not reach plaintiff's substantive Title VII and NYHRL claims, the Court need not address said arguments.

plaintiff cannot pursue an action under Title VII or the NYHRL because (1) she is not OLV's employee and (2) she does not have an employment relationship with her patients. The Court will decline to exercise supplemental jurisdiction over plaintiff's state law claim of tortious interference with business relations and, as such, the case will be dismissed.

The facts relevant to determining whether plaintiff falls within the purview of Title VII and the NYHRL, in the light most favorable to plaintiff — the non-moving party —, are found as follows and are undisputed except where otherwise noted.[7] Plaintiff is a board certified gastroenterologist and internist ("GI") licensed to practice medicine in New York State. OLV approved plaintiff's application for staff privileges and appointed her to OLV's medical staff with specific clinical privileges in the GI department on February 21, 1995 and such appointment continued until June 16, 2003.[8] These privileges allowed plaintiff to use OLV's equipment contained in OLV's endoscopy unit ("GI Lab") and thus were crucial to plaintiff's GI practice.

As a staff physician at OLV, plaintiff worked at OLV, admitted and treated her

---

[7]The October 5 Order sets forth plaintiff's factual assertions of defendants' alleged conduct on which her claims for harassment and discrimination are based. A reiteration of said facts is not necessary here as they do not bear on the outcome of the pending motion for summary judgment.

[8]OLV began a full asset merger with Mercy Hospital in late 1999, with Mercy Hospital to be the surviving corporation. On June 16, 2003, as part of the merger process, OLV's clinical services were transferred to Mercy Hospital, resulting in the automatic expiration of the medical staff membership and privileges of all physicians, including plaintiff, at OLV. OLV's merger status and plaintiff's current employment status with OLV are not relevant to the determination of this action.

and OLV's patients and performed endoscopies and other gastroenterological procedures in the GI Lab.  Plaintiff was obligated to admit a patient to OLV if a procedure-related event had occurred at the GI Lab or the patient's pre-existing condition had deteriorated at the time of an endoscopy.  Plaintiff claims that OLV and its Administration controlled her practice and work product by the quality management protocols and different policies that directed her patient care.  In particular, plaintiff had to agree to participate in OLV's "hospital quality assurance programs" in order to receive approval of her staff privileges.

An appointment to OLV's Medical Staff permitted plaintiff to admit patients to OLV or otherwise be regularly involved in the care of patients at OLV without limitation, unless otherwise provided in the Staff Rules and Regulations, and to exercise her GI clinical privileges.  OLV required plaintiff to conduct her practice in accordance with applicable federal and state laws, with clinical privileges based on her certification as a GI, with the requirements of certifying agencies, with the Medical Staff By-Laws, Rules and Regulations and with the standard of care appropriate to her GI practice area.

OLV conducted a department-wide peer review of plaintiff that resulted in the imposition of a reeducation and mentoring requirement, not in any suspension or termination of plaintiff's hospital privileges.  All members of OLV's GI Division, including plaintiff, participated in the division's standard quality assurance process under a rotating system that assigned the review of procedures performed to

different practitioners.  Nearly all of the GI procedures at OLV were reviewed under the quality assurance process.  Plaintiff claims that defendants discriminated against her by questioning her procedures and subsequently referring her to the peer review process.  Plaintiff contends that there was a possibility that this peer review process would result in a negative report to the National Practitioner Data Bank (the "Data Bank") which is accessible by all hospitals and is used to evaluate whether privileges should be granted to a physician.  It is undisputed that defendant never submitted a report to the Data Bank.

Plaintiff was required to pay for and maintain her own professional liability insurance.  She determined the hours and times that she worked and was not granted vacation time by OLV.  Free to have privileges and treat patients at other hospitals, plaintiff also maintained privileges at Buffalo General Hospital (now Kaleida), Mercy Hospital and St. Joseph's Hospital.  Plaintiff determined which patients to accept and treat and independently decided on the course of medical care, treatments and procedures necessary for each patient.  Patients whom she admitted to OLV remained under her care and responsibility.

Summary judgment may be granted if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FRCvP 56(c).  There is no genuine issue for trial unless the evidence offered favoring the non-moving party would be sufficient to sustain a jury's verdict for that party.  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

- 6 -

Thus, when reasonable minds could not differ as to the outcome of an issue, summary judgment is appropriate on that issue. *Id.* at 251-252. The moving party initially bears the burden of showing that no genuine issue of material fact is present but the opposing party must then "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. If the non-moving party fails to establish, after a reasonable opportunity for discovery, the existence of an element essential to that party's claim and on which it will bear the burden of proof at trial, summary judgment is appropriate because such failure to establish an essential element of the case renders all other facts immaterial. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-323 (1986).

When assessing the record in making a summary judgment determination, a court must view all ambiguities and factual inferences in the light most favorable to the non-moving party. *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, the non-moving party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." FRCvP 56(e); *Gottlieb* v. *County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

Of course, the summary judgment standard applies with equal force to discrimination cases as it does to other cases. *See Ashton* v. *Pall Corp.*, 32 F. Supp. 2d 82, 87 (E.D.N.Y. 1999) ("[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases

than to commercial or other areas of litigation.") (quoting *Meiri* v. *Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).   However, courts must be aware of the fact that evidence of discrimination is rarely overt.   *See Bickerstaff* v. *Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("[E]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law.") (quoting *Ramseur* v. *Chase Manhattan Bank*, 865 F.2d 460, 464-465 (2d Cir. 1989)). In addition, courts must "also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  *Ibid*.   Thus, the issue for the court is "whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances."  *Ibid.*

Title VII states that "[i]t shall be an unlawful employment practice for an employer $***$ to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin $***$."  42 U.S.C. §2000e-2(a)(1). Before determining whether there has been a violation of Title VII and the NYHRL, the Court must determine whether Title VII applies to the parties.   It is well established that Title VII and the NYHRL cover only employees.  *Eisenberg* v. *Advance Relocation & Storage, Inc.*, 237 F.3d 111, 113 (2d Cir. 2000) (citations

omitted).[9]  Although the particular issue of whether a physician with staff privileges

is an employee of the hospital in which she exercises her privileges has yet to be

presented before the Second Circuit Court of Appeals,[10] the Fourth, Fifth, Sixth and

Seventh Circuits have addressed the issue, all finding that said physicians are not

employees, and the Supreme Court has provided courts thirteen factors — which the

aforementioned circuits have applied — to use in determining whether a hired person

is an employee.  In applying the Supreme Court's standards and employing the other

circuit court decisions as instructive, the Court will find that plaintiff is not an

employee of OLV.

The Supreme Court has held that federal statutes, such as Title VII, "are

generally intended to have uniform nationwide application." *Cmty. for Creative Non-*

---

[9]Plaintiff asks the Court to first delve into the merits of her Title VII claim before determining whether she was intended to be within the scope of Title VII protections, claiming that "it is the remedial function and purpose of Title VII that should provide the definitional underpinning for what constitutes an employee under Title VII." (Pl.'s Mem. Opp'n Mot. Summ. J. at 5.)  Plaintiff's argument lacks foundation in law or rationale.  Congress intended Title VII to apply to employees and employers and courts, including the Second Circuit, have followed suit.  To first address whether plaintiff has met her Title VII *prima facie* burden would be futile if thereafter the Court determined that plaintiff was not intended to fall within the scope of Title VII protections.  Simply because plaintiff believes that she has been wronged does not justify the Court ignoring Congressional intent and binding law.  *See, e.g., Kunzler* v. *Canon, USA, Inc.*, 257 F. Supp. 2d 574, 583 (E.D.N.Y. 2003) ("Because the harassment reported here involved individuals who were not in an employment relationship, Plaintiff cannot be said to have ✱✱✱ report[ed] conduct prohibited by Title VII."); *Alexander* v. *Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996) ("The simple fact that the plaintiffs were not employees, that they could not demonstrate the existence of an employment relationship, rendered them without the ambit of Title VII protection and precluded them from bringing discrimination actions alleging violations of the Act.").

[10]The Second Circuit has, however, addressed this issue with regard to a physical therapist providing physical therapy services to patients at a nursing home.  *See Lee* v. *Glessing*, 51 Fed. Appx. 31 (2d Cir. 2002).

*Violence* v. *Reid*, 490 U.S. 730, 740 (1989) (citations and internal quotations omitted).

Thus, in defining the terms "employer", "employee" and "scope of employment" for

the purpose of applying federal statutes, the Supreme Court has instructed courts to

rely on "the general common law of agency, rather than on the law of any particular

State, to give meaning to these terms." *Ibid.* The Second Circuit Court of Appeals

has followed *Reid* when determining, *inter alia*, whether a hired person is an

employee — as opposed to an independent contractor — in the Title VII and NYHRL

context.[11] *Eisenberg*, at 113 (citations omitted); *see also O'Connor* v. *Davis*, 126 F.3d

112, 115 (2d Cir. 1997) ("[I]t is well established that when Congress uses the term

'employee' without defining it with precision, courts should presume that Congress

had in mind 'the conventional master-servant relationship as understood by the

common-law agency doctrine.'") (collecting Supreme Court and circuit court cases

that apply the common law of agency in defining "employee").

To maintain uniformity among the courts, the Supreme Court has delineated

the following thirteen factors — none of which is determinative — to be considered

in the assessment of whether a hired person is an employee under the common law

of agency:

---

[11]Plaintiff contends that the Court should apply either the "hybrid" or "economic realities" test to determine her employment status. The cases she cites in support of her claim were either decided before *Reid* and *Eisenberg* or are not binding to this Court. Moreover, both the Second Circuit and Supreme Court have made it clear that the common law of agency should be used to determine employment status in cases relying on federal statutes. As such, the Court will not apply the hybrid or economic realities test.

> "[1] the hiring party's right to control the manner and means by which the product is accomplished $_{***}$[;] [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party."

*Reid*, at 751-752.  Not all factors are relevant in every situation and the Court "must weigh in the balance only those factors that are actually indicative of agency in the particular circumstances $_{***}$."  *Langman Fabrics* v. *Graff Californiawear, Inc.*, 160 F.3d 106, 110-111 (2d Cir. 1998); *see also Eisenberg*, at 114 ("In balancing the *Reid* factors, a court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of 'indeterminate' weight — that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor.") (citations omitted).  In this Circuit, as in other circuits, "the 'greatest emphasis' should be placed on the first factor — that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks."  *Eisenberg*, at 114.  The Second Circuit explained that "[t]he first factor is entitled to this added weight because, under the common law of agency, an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and

the manner and means by which the purported employee brings about that result."

*Ibid* (citations and internal quotations omitted); *see also Bender* v. *Suburban Hosp. Inc.*, 159 F.3d 186, 190 (4th Cir. 1998) ("Although various factors are considered in determining whether an employment relationship exists, the critical question is 'the degree of control exercised by the hiring party' over 'the work and its instrumentalities and circumstances.'") (citing *Cilecek* v. *Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir.1997)); *Alexander* v. *Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492-493 (7th Cir. 1996) (same).

Plaintiff claims that (1) defendants exerted sufficient control over her through OLV's peer review process and operating policies, procedures and protocols to support a finding that she was an employee, (2) defendants controlled the amount of work available to plaintiff and thus controlled her payment and (3) the other *Reid* factors either support employee-status or are irrelevant. Defendants, on the other hand, contend that the factors either favor a non-employee finding — *viz.*, plaintiff controlled her practice and OLV did not provide plaintiff any remuneration — or are irrelevant or indeterminate. Looking at the thirteen factors, the Court will find that the factors either favor a finding of non-employee or are irrelevant to this case.

First, plaintiff contends that defendants exerted sufficient control over her by (1) determining and implementing operating policies and procedures with regard to GI procedures, (2) imposing procedures regarding patient care, (3) maintaining a peer review process that ensured a uniform and high standard of patient care, (4)

requiring plaintiff to be "on call" to treat OLV's and OLV's free clinic patients and (5) requiring plaintiff to attend mandatory meetings scheduled by OLV.  Plaintiff does admit, however, that she maintained professional independence with respect to diagnosing and treating her patients, but that, because she was dependent upon OLV's facilities to perform GI procedures, her ability to control her GI practice was limited.  Defendants maintain, however, that plaintiff — not defendants — controls her medical practice for her patients are under her care and responsibility. Defendants emphasize that plaintiff determines what patients to accept and treat and has full discretion as to their GI needs.  In *Lee* v. *Glessing*, 51 Fed. Appx. 31, 33 (2d Cir. 2002), the Second Circuit found that the control factor weighed in favor of a finding that the plaintiff, a physical therapist, was an independent contractor because, although the plaintiff provided services on the defendant's premises, used the defendant's equipment and was obligated to treat all of the defendant's patients for whom physical therapy was prescribed, he had a "high degree of autonomy *** in providing physical therapy services".  Here, plaintiff exerted even more control over her employment than the plaintiff in *Lee* — similar to *Lee*, plaintiff had ultimate control over the GI diagnoses, services and treatment plans that she provided to her patients, but, unlike *Lee* wherein the defendant determined which patients needed physical therapy, plaintiff retained her own patients and only on occasion was obligated to treat OLV's patients.

Furthermore, plaintiff does not — nor can she — contend that defendants controlled the "manner and means" by which she performed her GI duties on her patients.  *See Eisenberg*, at 114.  Defendants could not and did not have the right to control the "result to be accomplished" — *viz.*, the diagnosis — and the "manner and means" by which the diagnosis was to be determined.  *See ibid.*  A physician's professional obligation cannot allow the hospital in which she works to dictate the diagnoses or the manner in which diagnoses are reached; rather, such is determined by the education and specialty of the physician and the particular medical needs of the patient.  Plaintiff claims that OLV's control over her is evident in the alleged effect the review process had on her career.  This argument, however, ignores the Second Circuit's explanation of the "control factor" — to wit, the control the alleged employer has on the hired person's tasks, not the circumstances of her work.  *See, e.g., Lee*, at 33 (finding that the plaintiff was an employee because he was responsible for the tasks of his job — to wit, how the patients were treated and "what form the treatment took"); *Robb* v. *United States*, 80 F.3d 884, 889 (4th Cir. 1996) ("[W]hen examining the extent of the principal's control over the purported employee, the real test is control over the *primary activity* contracted for and not the peripheral, administrative acts relating to such activity.") (citation and internal quotations omitted; emphasis added); *Alexander*, at 493 (finding that an employer/employee relationship exists if the employer controls and directs not "only ∗∗∗ the result to be achieved, but also ∗∗∗ the details by which that result is achieved") (citations and

- 14 -

internal quotations omitted).  Plaintiff asserts that OLV "mandate[d] [her] to perform outpatient endoscopies irrespective of plaintiff's medical judgment to the contrary" and "required [her] to abide by OLV's rules, regulations and procedural guidelines, even at the direct expense of her medical judgment and the best interest of her patients."  (Pl.'s Mem. Opp'n Mot. Summ. J. at 13, 31.)  If such were true, plaintiff would be in violation of her professional duties and obligations to her patients and, as such, is opening herself up to malpractice and negligence suits.  *See Wood* v. *United States*, 494 F. Supp. 792, 798-799 (D.C. Va. 1980), rev'd on other grounds, 671 F.2d 825 (4th Cir. 1982) ("No physician can permit himself to be controlled by an outside agency in the professional medical treatment of a patient.").  "[A] physician, properly serving his patient, * * * is not subject to external control in the exercise of his professional judgment". *Ibid.* Thus, plaintiff cannot contend that she diagnosed patients according to the demands of OLV.  Plaintiff may have felt pressure to abide by OLV's guidelines or procedures, but such is different from OLV and the Administration telling her how to perform and complete her GI diagnoses and treatments.

The Fourth Circuit has addressed an argument similar to that which plaintiff is making — to wit, that OLV exerted control over her by implementing policies, procedures and reviews.  The Fourth Circuit has held that a hospital's rules governing the conduct of physicians "relate[s] to the professional standard for providing health care to patients" and serves as a protection against professional

liability and is not the appropriate measure of "control".  *Cilecek*, at 262 ("Because of the overarching demands of the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not *** a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.").   The Fourth Circuit has found that control and the manner in which it is exerted "is related to the work itself and the industry in which it is performed."  *Id.* at 260.[12]  "A doctor must have direct control to make decisions for providing medical care, but the hospital must assert a degree of conflicting control over every doctor's work -- whether an employee, an independent contractor, or a doctor merely with privileges -- to discharge its own professional responsibility to patients."  *Ibid.*  The Fourth Circuit, in citing *Alexander* — a Seventh Circuit decision —, held that, although the common law agency distinction "between an employee and an independent contractor rests on the degree of control exercised by the hiring party", in the context of a physician with staff privileges at a hospital, "[m]ore enlightening is the control involved in deciding when a doctor performs his services, the number of hours he performs them, and the administrative details incident to his professional services."  *Ibid.*  The *Cilecek* court found — as have other circuits — that

---

[12]*See also Restatement (Second) of Agency* §220(1) cmt. e (1958) ("Those rendering service but retaining control over the manner of doing it are not [employees].  They may be agents, agreeing to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house.  An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results.  [T]hey are both 'independent contractors' ***.").

the plaintiff physician with staff privileges is not, as a matter of law, an employee of the defendant hospital for purposes of Title VII even when the hospital exerted "control" in the form of quality control procedures and peer review mechanisms. *See also Shah* v. *Deaconess Hosp.*, 355 F.3d 496, 500 (6th Cir. 2004) ("Although the hospital requires all physicians having surgical privileges to abide by the applicable standard of care, this requirement applies regardless of employment status and is enforced only after-the-fact, through the peer review process. Nothing in the record suggests that [the hospital] has the right to interfere with [the plaintiff physician's] medical discretion or otherwise control the manner and means of his performance as a surgeon."); *Alexander*, at 493 (finding that, although the plaintiff physician did not supply his own equipment or assistants, he was required to spend a specified amount of time per week "on call" and most of his operating room patients were assigned to him on a daily basis by the anesthesiology section head, "the manner in which [he] rendered services to his patients was primarily within his sole control" because "he had the authority to exercise his own independent discretion concerning the care he delivered to his patients based on his professional judgment as to what was in their best interests"); *Diggs* v. *Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 273 (5th Cir. 1988) ("While the hospital supplies the tools, staff and equipment utilized by [the plaintiff physician] in delivering medical care at the hospital, and while it imposes standards upon those permitted to hold staff privileges, the hospital does

not direct the manner or means by which [the plaintiff physician] renders medical care.").

Similarly here, plaintiff is not an employee within the meaning of Title VII because OLV did not have "the right to control" her practice.  By plaintiff's own admission, she diagnosed and treated her patients based on her independent professional judgment.  OLV's policies and procedural guidelines were not aimed at controlling the manner in which plaintiff treated and diagnosed her patients, but at avoiding liability and at complying with state and federal statutes and regulations. In *Shah*, *Cilecek* and *Diggs*, the plaintiff physicians were subject to the standards of care espoused by their respective hospitals.  The circuit courts held that hospital procedures and peer review programs do not control the manner in which employee and non-employee physicians render care and perform their duties; rather, they universally apply to all physicians — employees or non-employees — and do not affect the details concerning the physician's work.  *See Shah*, at 500; *Diggs*, at 273 ("As a provisional staff member [the plaintiff physician] was required to have a sponsor present during surgical procedures, but the purpose of that requirement was to have someone attest to her essential qualifications, not to direct the details of the exercise of her skill."); *Cilecek*, at 262 (holding that the hospital's regulations were "to maintain standards of patient care, to keep appropriate records, and to follow established procedures", not to control the way in which the plaintiff physician performed his duties).  Therefore, OLV did not control the manner in and means by

which plaintiff conducted her GI practice and the control factor favors a finding that plaintiff was not OLV's employee.

The remaining factors also favor a finding of non-employee or are irrelevant. Both parties agree that the fifth factor — *viz.*, the duration of their relationship — and the ninth factor — *viz.*, the hiring and payment of assistants — are irrelevant factors. As to the second factor, plaintiff is clearly a very skilled professional, which favors a finding of non-employee.  *See Aymes* v. *Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992).[13]

The third and fourth factors do not bear on this analysis.  Plaintiff asserts that the tools necessary to perform her job were located at OLV because only hospitals could afford GI equipment.  She furthermore contends that OLV controlled when she could have access to these tools by regulating the hours that the GI lab was open. Both the facts that the tools were located at OLV and that OLV controlled its hours of operations are true in every physician-hospital situation regardless of whether or not such amounts to an employee-employer relationship and therefore is indeterminate.  *See, e.g., Cilecek*, at 262 ("[Plaintiff's use of the] instruments of the hospital emergency room that were supplied by the hospital is $_{***}$ inherent in the provision of emergency medical services and $_{***}$ not a reliable indicator of employee

---

[13]Plaintiff cites *Aymes* in claiming her skill level supports a finding of employee because the *Aymes* court lists "architects, photographers, graphic artists, drafters and $_{***}$ computer programers [as] highly-skilled independent contractors."  *Id.* at 862.  Plaintiff claims that physicians are not on the list and thus not independent contractors.  First, there is no indication that this list was meant to be complete and, second, the Second Circuit has found as independent contractors positions not listed in *Aymes.  See, e.g., Lee*, at 33.

status. $_{* * *}$ Moreover, the number of hours announced by the hospital $_{* * *}$ represented a coordination with the needs of the hospital in staffing the emergency room.").

With regards to the sixth factor — *viz.*, the right to assign additional projects —, plaintiff maintains that her requirement to be "on call" and to provide services to OLV's patients favors a finding that she was OLV's employee.   Several courts, however, have found that the "on call" requirement does not necessarily create an employer-employee relationship. *See, e.g, Alexander*, at 493 (finding that the plaintiff physician's requirement to be "on call" was a product of his position and not sufficient to establish an employer-employee relationship).   Moreover, plaintiff has not alleged that a substantial or even a measurable portion of her work was for patients assigned to her by OLV.   Finally, in *Lee*, all of the plaintiff's patients were assigned to him, yet he was found to be an independent contractor.   *Id.* at 33.   This factor, accordingly, does not favor either a finding of employee or non-employee.

Next, in addressing the seventh factor, plaintiff claims that, although admittedly she had the power to schedule her appointments for her patients, OLV had the power to control her overall schedule by controlling the hours of operation of the GI lab and by requiring her to be "on call".   As explained *supra*, circuit courts have held that such "control" is merely a byproduct of being a physician and does not favor an employee finding.   Courts have found that such autonomy in the hours worked favors a non-employee finding.   *See, e.g., Shah*, at 500; *Cilecek*, at 262.

Plaintiff's control over her individual hours, although within the confines of OLV's hours of operation, favors a finding that she was not OLV's employee.

The tenth and eleventh factors — *viz.*, whether the work is part of the regular business of the hiring party and whether the hiring party is in business — are not persuasive in either direction. Although plaintiff's contention that her work as a GI furthers OLV's business of treating patients is valid, every physician with staff privileges can assert such whether she is an employee or an independent contractor. Thus, these factors do not weigh in favor of either party. *See Aymes*, at 863 ("[Certain] factors are relatively insignificant or negligible in weight because they are either indeterminate or inapplicable to these facts.").

The eighth, twelfth and thirteenth factors — *viz.*, the remuneration factors — heavily favor a finding of non-employee. In the Second Circuit, employment status "under Title VII usually turns on whether [the hired person] has received "direct or indirect remuneration from the alleged employer." *Pietras* v. *Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 473 (2d Cir. 1999) (citation and internal quotations omitted). Although a "financial benefit ✱✱✱ obtained by the purported employee from the employer ✱✱✱ 'is not a sufficient condition [of finding an employment relationship], ✱✱✱ it is an essential condition to the existence of an employer-employee relationship.'" *O'Connor*, at 115-116 (quoting *Graves* v. *Women's Prof'l Rodeo Ass'n*, 907 F.2d 71, 73 (8th Cir. 1990)); *see also Wadler* v. *E. Coll. Athletic Conference*, 2003 WL 21961119, at *3 (S.D.N.Y. 2003) ("While the majority of the *Reid*

factors ***, on balance, suggest that the [defendant] was [the plaintiff's] employer, the most critical factor here is that the [defendant] did not compensate [the plaintiff].").  Indicators of a "financial benefit" are those benefits that "primarily benefit the employee independently of the employer" and include the following: "salary or other wages; employee benefits, such as health insurance; vacation; sick pay; or the promise of any of the foregoing."  *York* v. *Ass'n of the Bar of the City of New York*, 286 F.3d 122, 126 (2d Cir. 2002) (citing *O'Connor*, at 116).  Here, plaintiff did not receive a financial benefit, as defined by the Second Circuit, from OLV.

Plaintiff contends that, because OLV controlled the number of patients she had through referrals, OLV therefore controlled her payment.  It is undisputed that OLV does not pay plaintiff anything, OLV does not provide plaintiff with employee benefits or vacation days and plaintiff has to provide her own professional liability insurance. In *Wadler*, the plaintiff made the same argument that plaintiff is making here — to wit, that plaintiff's compensation is a result of her privileges at OLV.  The *Wadler* court found that, although the defendant "was solely responsible for determining whether the [p]laintiff was employed", the plaintiff's lack of direct or indirect remuneration from the defendant rendered him a non-employee. *Id.* at *3.  Here, OLV is not "solely responsible" for plaintiff's patients — she can seek referrals from non-OLV doctors.  Moreover, all the circuit decisions cited *supra* have found that lack of remuneration heavily favors a finding of non-employee. *See, e.g., Shah*, at 500 (finding that the plaintiff physician did not receive any payment from the hospital and was not

treated as an employee for tax purposes); *Cilecek*, at 261 (same).  Therefore, the *Reid* factors that are relevant to this analysis all favor a finding that plaintiff was not OLV's employee under Title VII and the NYHRL.

In the alternative, plaintiff claims that, if the Court finds — as it will — that she is not OLV's employee, OLV is still liable under Title VII for interfering with her future employment opportunities.  This argument also fails because plaintiff's relationship with her patients is not an employee-employer relationship and plaintiff cannot show that OLV interfered with her future employment opportunities at other hospitals. Courts have recognized that "the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *Spirt* v. *Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2d Cir. 1982), vacated and remanded on other grounds, 463 U.S. 1223 (1983); *see also Sibley Memorial Hosp.* v. *Wilson*, 488 F.2d 1338, 1340-1342 (D.C. Cir. 1973).  The crux to such an allegation is a showing that defendants "intruded" between plaintiff and a potential employer.  *Sibley*, at 1342.  Thus, plaintiff has to first show the existence of a potential employer — using the common law of agency definition enunciated *supra* — and then show that defendants intruded on her relationship with said employer.  *Bender* v. *Suburban Hosp., Inc.*, 159 F.3d 186, 189 (4th Cir. 1998) ("[A] plaintiff [is required] to allege harm to an employer-employee

relationship, as defined by the law of agency. *** [A]ny other rule would extend Title VII's reach to any and every relationship that an employer's discrimination might harm in any way ***.").

Plaintiff claims that OLV's peer review process and alleged redirection of referrals from plaintiff to other physicians deprived her of prospective patients. Plaintiff, however, does not have an employee-employer relationship with her patients.  Again, based on the common law of agency definition of "employee," patients are not the employers of their physicians — they exert no control over their physicians and, instead, the physicians have control over the relationship and the manner in and terms under which it is carried out.  *Diggs*, at 274 (stating that a physician's relationship to her patients is not one of employment); *Alexander*, at 493 n.2 (same); *Beverley* v. *Douglas*, 591 F. Supp. 1321, 1328 (S.D.N.Y. 1984) (same).[14] Patients are paying for a service, not serving as an employer.

Plaintiff cites *Sibley* in arguing that OLV prevented employment opportunities between her and her patients.[15]  In *Sibley*, however, the patients were responsible

_____

[14]*See also Nanavati* v. *Burdette Tomlin Memorial Hosp.*, 1986 WL 15318, at *4 (D.N.J. 1986) ("Patients do not control the 'means and manner' of their doctor's performance, nor do they furnish the equipment used or the place of work.  Both the patient and his doctor are free to terminate their relationship at any time, without notice, and, aside from compensation for specific services rendered, the patient provides no employment 'benefits' to the physician.  In short, medical doctors, as professionals practicing a highly specialized and skilled occupation, are not 'employees' of their patients.").

[15]Plaintiff also cites *Pao* v. *Holy Redeemer Hospital*, 547 F. Supp. 484 (E.D. Pa. 1982), in claiming that she has an employment relationship with her patients.  The court in *Pao*, however, was — at the motion to dismiss stage — addressing whether plaintiff had an employment relationship with the hospital.  *Id.* at 494 ("[T]he focal question is whether the defendants can

(continued...)

for the plaintiff private duty nurse's compensation and could reject or terminate his services for any or no reason but would have to pay him regardless  and the hospital had complete control over access to the patients through an official patient referral program — to wit, the patients requested nurse services and the hospital, through a registry and referral system, assigned the private duty nurses to the patients.  488 F.2d at 1339.  Here, no such referral program exists.  Specialist referrals are based on a physician's professional judgment and personal preferences.  No official, formal and/or required referral system was in place at OLV.[16]

OLV did not deny plaintiff an opportunity to provide patient care because her OLV staff privileges were never revoked and her name was not submitted to the Data Bank.  *Compare Ikpoh, supra* note 16, at *19 (finding that the hospital's denial of the plaintiff physician's staff privileges denied him the opportunity of gaining access to the hospital's patients, whom the hospital was required to refer to hospital

---

[15](...continued)
be considered employers whose allegedly invidious conduct deprived the plaintiff of an employment opportunity with the meaning of [Title VII].").

[16]Plaintiff also cites *Ikpoh* v. *Central DuPage Hospital*, 1993 WL 524817, at *19 (N.D. Ill. 1993), in support of her claim.  In *Ikpoh*, the Magistrate Judge based his finding on "the Seventh Circuit's definition of an employment relationship as including the physician/patient relationship. *Mitchell v. Tenney*, 650 F. Supp. 703, 706 (N.D. Ill. 1986)." This definition, however, has since been overruled in the Seventh Circuit's 1996 decision in which the court held that a doctor is "not an employee of his patients, just as an insurance agent or a limousine driver is not an employee of her customers." *Alexander*, at 493 n.2.  The Judge in *Ikpoh* found that the plaintiff had established his *prima facie* Title VII case because he was denied staff privileges at a hospital that operates a physician referral system through which the hospital directs patients to its staff physicians and denial of privileges denies access to all those patients. *Id.* at *19-*20. First, the Seventh Circuit no longer finds the physician/patient relationship to be one of employment and, second, plaintiff's staff privileges here were never denied or revoked.

physicians); *Gomez* v. *Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1021 (9th Cir. 1983) (finding that the hospital's failure to award the contract to the plaintiff's employer deprived him of an employment opportunity as the director of the hospital's emergency room because, without the contract, the plaintiff could not be the director of the hospital's emergency room).  Furthermore, plaintiff does not allege that OLV was under an obligation to refer patients to her.  She simply claims that referrals from defendants stopped.

Finally, plaintiff's contention that the potential for defendants to enter her in the Data Bank and the perception that OLV took adverse action against her will have a negative impact on her career cannot stand.  Plaintiff must allege an injury-in-fact — *viz.*, "that as a result of the defendant's *actions* [s]he has suffered a distinct and palpable injury".  *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 372 (1982) (citation and internal quotations omitted; emphasis added).  The fact that defendants *could have* placed plaintiff's name in the Data Bank —  but did not — cannot be the basis for liability.  To hold otherwise would extend liability from that which has occurred to anything that could occur; in other words, there would be no end to liability. Plaintiff, therefore, does not have an employment relationship with her patients and OLV did not interfere with her future employment opportunities with other hospitals. As such, plaintiff has no claim under Title VII and the NYHRL.  Plaintiff's only remaining claim is her state law claim of tortious interference with business relations, over which the Court declines to exercise supplemental jurisdiction.

Accordingly, it is hereby **ORDERED** that defendants Our Lady of Victory Hospital's, Franklin Zeplowitz's and John P. Davanzo's motion for summary judgment is granted, that defendant Michael C. Moore's motion for summary judgment is granted, that defendant Albert J. Diaz-Ordaz's motion for summary judgment is granted, that defendant John F. Reilly's motion for summary judgment is granted, that plaintiff's Title VII and NYHRL claims are dismissed, that the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims and that the Clerk of the Court shall close this case.

DATED:      Buffalo, N.Y.

            March 8, 2006


                                    _____/s/ John T. Elfvin_____
                                          JOHN T. ELFVIN
                                             S.U.S.D.J.