UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BARBARA E. SALAMON, M.D.

                              Plaintiff,

        v.                                            **DECISION AND ORDER**
                                                      99-CV-048S

OUR LADY OF VICTORY HOSPITAL,
MICHAEL C. MOORE, M.D.,
FRANKLIN ZEPLOWITZ, M.D.,
JOHN F. REILLY, M.D.,
ALBERT J. DIAZ-ORDAZ, M.D., and
JOHN P. DAVANZO,

                              Defendants.


# I. INTRODUCTION

        Plaintiff Barbara E. Salamon, M.D., commenced this action on January 21, 1999

against Defendants Our Lady of Victory Hospital ("OLV" or "the Hospital") and five medical

personnel associated therewith–Dr. Michael C. Moore, Dr. Franklin Zeplowitz, Dr. John F.

Reilly, Dr. Albert J. Diaz-Ordaz, and John P. Davanzo (collectively referred to herein as

"Defendants"). In her Amended Complaint (Docket No. 5), Plaintiff alleged, inter alia, that

defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

("Title VII"), and the New York State Human Rights Law, N.Y. Exec. L. § 290 et. seq.

("NYSHRL"),[1] by subjecting her to sexual harassment, discrimination, and by conspiring

to negatively impact her future employment opportunities. She further alleged violations of

---

[1] NYSHRL claims are analytically identical to claims brought under Title VII. Van Zant v. KLM
Royal Dutch Airlines, 80 F.3d 708, 714–15 (2d Cir.1996) (citations omitted).

New York State common law by tortiously interfering with her business relations.

In a previous Decision and Order this Court (Elfvin, J.) granted summary judgment in favor of the Defendants, dismissing Plaintiff's Title VII and NYHRL claims on the ground that she was not an employee of OLV, rejecting her Title VII claim under <u>Sibley Memorial Hospital v. Wilson,</u> 488 F.2d 1338 (D.C. Cir.1973), and declining to exercise supplemental jurisdiction over the remaining state tortious interference claims. (Docket No. 127.)  The Court of Appeals for the Second Circuit vacated this Court's decision as to Plaintiff's Title VII and NYHRL claims, holding that genuine issues of material fact existed as to the degree of control OLV exercised over Plaintiff for purposes of determining whether she was an "employee" under Title VII. (Docket No. 163.)

Defendants' Motions for Summary Judgment (Docket Nos. 101, 104, 106, 107) are again before this Court.[2] For the following reasons, this Court finds that Defendants are not entitled to summary judgment.

## II. BACKGROUND

### A.     Procedural History

Plaintiff, a female gastroenterologist, was a member of the medical staff at OLV with privileges in gastroenterology. She commenced this action against OLV and the other defendants on January 21, 1999, and filed an Amended Complaint on March 5, 1999.

---

[2] In the interest of judicial economy, Defendants Reilly, Diaz-Ortiz, and Moore have adopted the affidavits and memorandum of law submitted by Defendants OLV, Zeplowitz, and Davanzo, in support of their summary judgment motions. While Defendants' four motions have been docketed individually, this Court will treat their submissions as a collective motion for summary judgment.

(Docket Nos. 1, 5.)[3] The Amended Complaint asserted eight causes of action, the first five of which were brought under anti-trust law, and were dismissed by this Court (Elfvin, J.) pursuant to Fed. R. Civ. P. 12(b)(6) by Order dated October 5, 1999. (Docket No. 20.) The sixth and seventh causes of action alleged sexual harassment, and a discriminatory OLV "peer review" process that resulted in a "reeducation" and mentoring requirement in violation of Title VII and NYSHRL. The eighth cause of action asserted state law claims for tortious interference with contract and prospective business relations.

Defendants moved for summary judgment on February 12, 2001. (Docket Nos. 38, 39, 41, 43.) This Court then granted Plaintiff's motions under former Fed. R. Civ. P. 56(f), allowing Plaintiff additional time to conduct discovery to oppose the Defendants' motion. Plaintiff's opposition papers were filed on May 21, 2004, and Defendants submitted their reply on July 21, 2004. The motion was orally argued and submitted on July 30, 2004.

On March 8, 2006, this Court (Elfvin, J.) issued a decision granting summary judgment in the Defendants favor on Plaintiff's Title VII and NYSHRL claims for lack of the required employee-employer relationship, and declining to exercise supplemental jurisdiction over her remaining state law claims.

In an amended decision, a panel of the Second Circuit vacated the entry of summary judgment and remanded the case for further consideration of the Defendants' motion. (Docket No. 162.) Specifically, the Second Circuit found that "viewing the circumstances of this particular case in the light most favorable to the plaintiff, the non-

---

[3] Plaintiff first filed a complaint with the U.S. Equal employment Opportunity Commission ("EEOC") on December 29, 1998. The EEOC dismissed the complaint, finding that she was not an employee of OLV.

moving party, [Plaintiff] has demonstrated a genuine factual conflict regarding the degree of control OLV exercised over her," and instructed that, on remand, the district court was to reweigh all of the thirteen factors set forth in Community for Creative Non-Violence v. Reid, 490 U.S. 730 (1989) to determine whether Plaintiff was an employee of the Hospital for purposes of Title VII. Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 231 (2d Cir. 2008).

Defendants have now renewed their motion for summary judgment. Save for a handful of supplemental filings, the parties rely in large part on their previously-filed papers.

## B.    Factual Background

### 1.    The Parties

Plaintiff is a physician licensed to practice in the State of New York, board certified in Internal Medicine and Gastroenterology ("GI").  In 1995,[4] Plaintiff applied for and was granted temporary staff privileges at OLV. At the time, Plaintiff was the only female physician in the GI Division. Following a full asset merger of OLV and Mercy Hospital (with Mercy Hospital to be the surviving corporation), Plaintiff's medical staff membership and privileges at OLV automatically expired as of June 16, 2003, when OLV's Operating Certificate expired. Thus, Plaintiff remained on staff continuously at OLV for a period of nearly nine years. During that time, she was subject to OLV's Staff Rules and Regulations and the requirements of various certifying agencies as well as applicable state and federal laws. (Def. Stmt. of Facts, (Docket No. 103) ¶¶ 1-6.)

During the times relevant to this action, Michael Moore, M.D. ("Moore") was the

---

[4] Plaintiff asserts that she was granted associate staff privileges in 1994. (Pl. Aff., ¶ 6.) This Court does not consider this to be material as Plaintiff remained on staff at OLV for a period of nearly nine years.

Chief of OLV's Gastroenterology Division, and a member of the OLV Board of Directors, the Professional Affairs/Credentialing Committee, the Quality Assurance/Utilization Management Committee, the Human Resources Committee of the Board, and later became president of Medical Staff at Mercy Hospital. Franklin Zeplowitz, M.D. ("Zeplowitz") was OLV's Chief of Staff, Vice President of Medical Affairs, Chairman of the Medical Executive Committee and the Chief of OLV's Credentials, Quality Assurance and By-Laws Committees. John Reilly ("Reilly") was OLV's Chief of Medicine and a member of OLV's Medical Executive Committee. Albert Diaz-Ordaz ("Diaz-Ordaz") was a member of OLV's Quality Assurance Committee, and John Davanzo ("Davanzo") was OLV's President/Chief Executive Officer. (Pl. Aff., (Docket No. 149) ¶¶ 8-10.)

2.     **Plaintiff's Relationship with OLV**

Plaintiff received the privileges and was subject to the duties of all staff physicians at OLV. (Def. Stmt. of Facts, ¶ 10.) Her clinical privileges extended to the use of the hospital's facilities, including access to the endoscopy equipment in the GI lab, which was vital to her practice. Plaintiff contends that she was wholly dependent on OLV's instrumentalities to work. Plaintiff was required to use OLV's nursing and support staff in her treatment of patients at the Hospital. (Pl. Aff., ¶¶ 4, 6, 155, 175.)

Plaintiff was generally free to set her own hours and maintain her own patient load, subject to the availability of the endoscopy equipment, which the Hospital controlled, and to an on-call requirement discussed below. (Def. Stmt. of Facts, ¶¶ 16-17; Pl. Aff. ¶¶ 36, 148.) She determined which patients to see and treat, and whether or not to admit them to OLV (or another hospital). Plaintiff was allowed to maintain staff privileges at other hospitals, and she did so, although the majority of her practice was at OLV.  (Def. Stmt. of

Facts, ¶¶ 17-18; Pl. Aff. ¶¶ 558-59.) OLV did not pay her a salary, wages, benefits, or any other monetary compensation. She billed patients (or their insurers) directly for her services, while OLV billed them separately for the corresponding use of its facilities. Plaintiff carried her own professional liability insurance. (Def. Stmt. of Facts, ¶¶ 12, 19-22.)

Plaintiff, like all physicians at OLV, was subject  to the Hospital's policies, supervision and management, including Staff Rules and Regulations and Hospital by-laws. (Def. Stmt. of Facts, ¶¶ 10-11.) Plaintiff was also obliged to participate in regular staff meetings and spend a certain amount of time "on call" for OLV. During this required on-call time, Plaintiff was required to treat OLV patient needs as they arose, whether or not they were her patients. This duty extended to "follow up" treatment, obligating her to continue treating a patient she had first seen while on call, even after her on-call time was over. (Pl. Aff., ¶¶ 74-77.)

The most significant mechanism of supervision over Plaintiff, and the focal point of the Second Circuit's decision, was OLV's Quality Assurance ("QA") Program, in which Plaintiff was required to participate as a condition of her privileges. Under the QA Program, different hospital practitioners, on a rotating basis, would review procedures that had been conducted during the quarter. Cases flagged as potentially problematic would be discussed at mandatory GI Division meetings. OLV also had a peer review process for further examining the practice of doctors whose cases had been flagged through the QA Program. Def. Stmt. of Facts, ¶¶ 26-27; Pl. Aff., ¶¶ 38-53.)

Finally, OLV also reported to the National Practitioner's Data Bank ("NPDB"), a database that contains adverse information about doctors that would be queried when a doctor sought privileges at a hospital. According to Plaintiff, the QA Program included

detailed requirements as to when and how her work was to be performed, requirements intended in some cases to maximize profits, not patient care. (Pl. Aff., ¶¶ 61, 64-65.)

### 3.    Claims of Harassment

From the beginning of her time at OLV in September, 1994, Plaintiff alleges that Defendant Moore made a number of inappropriate and unwelcome comments to her. Over time, those comments escalated in frequency and in nature, and became increasingly sexual, despite Plaintiff's complaints about Moore's behavior. Plaintiff also felt that she was subject to a hostile work environment based on Moore's ongoing sexual relationship with a female nurse in the GI Division. Around this time, Moore began selecting Plaintiff's cases for peer review at the GI Division's quarterly meetings. While Plaintiff's cases were selected for review, inappropriate and inadequate treatment provided by the male physicians (including Moore himself) in the GI Division was overlooked. (Pl. Aff., ¶¶ 80-88, 176-228, 229-276.)

After repeatedly rejecting Moore's advances, Plaintiff met with Albert Condino ("Condino"), OLV's former CEO,[5] and Defendant Zeplowitz, in August, 1999, to advise them of Moore's sexual harassment and the unfair treatment she was receiving during the QA meetings. Although Condino and Zeplowitz assured Plaintiff that her claims would be investigated, the Defendants did not conduct any investigation of Plaintiff's allegations of sexual harassment against Moore. Moore denied Plaintiff's allegations, and Condino and Zeplowitz concluded that Plaintiff's complaints were unfounded. (Pl. Aff., ¶¶ 229-246, 252.)

---

[5] Defendant Davanzo succeeded Condino in this position.

### 4.     Claims of Discrimination and Retaliation

At a subsequent meeting with Condino and Zeplowitz, Plaintiff was informed that OLV's Department of Medicine would conduct a general review of procedures across the GI Division. Instead, Condino and Zeplowitz initiated a review of Plaintiff's patient procedures dating back one and-a-half years, including cases that had previously been peer reviewed and were not identified as being problematic. Condino and Zeplowitz assigned Defendant Moore and two other doctors to review the procedure reports for Plaintiff's cases.   Plaintiff alleges that the reviewing physicians provided incorrect, misleading, and/or false information in the internal reviews. Further, no other physician was subject to the same peer review process, and  Plaintiff's practice was not compared to that of the male gastroenterologists at OLV. (Pl. Aff., ¶¶ 251-276.)

Plaintiff's work was then subjected to several additional levels of review, which yielded conflicting results. For example, one physician, who was not a specialist in the peer review process, provided an unfavorable report, while a second external review of the same cases indicated that Plaintiff's practice met community and national standards of care.  Plaintiff was also subject to the following: a three-physician internal review; a review by a five-physician ad hoc committee, including an interview with Plaintiff and submission of written arguments by her; ratification of the ad hoc committee's review by an eleven-physician Medical Executive Committee ("MEC") following an appearance and written submissions by Plaintiff; a hearing before a five-physician hearing panel, including testimony and cross-examination by Plaintiff, on Plaintiff's appeal from the MEC's determination; and, at Plaintiff's request, further review by the OLV Board of Directors. (Pl. Aff. ¶¶ 277-352.)

Following Plaintiff's unsuccessful challenges to the peer review process, the Defendants decided to impose a "reeducation" plan on Plaintiff, also over Plaintiff's objection.   Ultimately, however, no physician mentor could be found to accept the responsibility to carry out the proposed program, and the reeducation requirement ultimately became moot as OLV merged into Mercy Hospital in 2003, ending Plaintiff's medical staff privileges at OLV. (Pl. Aff., ¶¶ 353-389.)

During this time period,  Plaintiff's procedures and consultations at OLV diminished in numbers, as did her referrals from other physicians. Although no report was ever made to the NPDB, Plaintiff's reputation of poor work quality had spread throughout the area and caused severe injury to Plaintiff's practice. (Pl. Aff., ¶¶ 559-561, 566, 578-579.)

## III. DISCUSSION

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." <u>Anderson v. Liberty Lobby</u>, <u>Inc.</u>, 477 U.S. 242, 248 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u> In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970) (internal quotations and citation omitted).

"Only when reasonable minds could not differ as to the import of evidence is

summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

**B.    Title VII**

Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). It is well-settled that "Title VII and NYHRL Title VII and the NYHRL cover 'employees,' not independent contractors." <u>Eisenberg v. Advance Relocation & Storage</u>, Inc., 237 F.3d 111, 113 (2d Cir. 2000).

As the Second Circuit noted in <u>Salamon</u>, a reviewing court must  look to the common law of agency in addressing whether a plaintiff is an employee or an independent contractor. <u>Salamon</u>, 514 F.3d at 226–27 (citing cases) (applying common-law agency test to Title VII claims); <u>Fowler v. Scores Holding Co., Inc.</u>, 677 F.Supp.2d 673, 679 (same for NYSHRL claims). The common-law agency test "depends on a fact specific analysis of thirteen factors articulated by the Supreme Court in <u>Community for Creative Non-violence v. Reid</u>, 490 U.S. 730 ... (1989)." <u>Salamon</u>, 514 F.3d at 226. The "<u>Reid</u> factors" are as follows:

> [1] the hiring party's right to control the manner and means by

10

> which the product is accomplished[,] .... [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; [13] and the tax treatment of the hired party.

Id. (quoting Reid, 490 U.S. at 751–52).

In applying the Reid factors, "a court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant[,] or (2) of 'indeterminate' weight." Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000). Although no single Reid factor is dispositive, the Second Circuit has found that in the context of anti-discrimination cases, the " 'greatest emphasis' should be placed on the first factor-that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks." Eisenberg, 237 F.3d at 114 (quoting Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir. 1993); Salamon, 514 F.3d at 227-28 ("What is at issue is not merely the right to dictate the outcome of the work, but the right to control the 'manner and means' by which the hiree accomplishes that outcome."). "The issue of whether a hired worker is an independent contractor or an employee is 'typically a question for the factfinder, unless the evidence in the record relevant to this question is undisputed, in which case a court may resolve the issue as a matter of law.'" Nazinitsky v. Fairmont Ins. Brokers, Ltd., 06-CV-5555, 2010 WL 836766, at *8 (E.D.N.Y. Mar. 8, 2010) (quoting Murphy v. Guilford Mills, Inc., 02-CV-10105, 2005 WL 957333, at *5 (S.D.N.Y. Apr. 22, 2005).

C.      **Application of the** <u>**Reid**</u> **Factors**

Defendants, in their motion for summary judgment, argue that, upon reweighing all of the <u>Reid</u> factors, Plaintiff is an independent contractor for purposes of Title VII protection. (Def. Supp. Mem. (Docket No. 139) at 6.)

The record indicates that there are disputes of fact between the parties on at least three of the <u>Reid</u> factors. In particular, the Plaintiff claims that the Defendants exerted sufficient control over Plaintiff's manner and means of work; the level of skill required to perform her job does not preclude employee status; she was wholly dependent on OLV's instrumentalities and tools when she a member of the medical staff;  that her work was essential to OLV's business, and that the economic factors, i.e., tax treatment, benefits, and salary, tip in favor of finding that Plaintiff was an employee of OLV. (Pl. Mem. 5/21/04 (Docket No. 108) at 10-19.)[6]  This Court will therefore analyze the facts presented by Defendants to support their argument that Plaintiff was an independent contractor, and contrast those facts with the ones advanced by Plaintiff to show the contrary.

1.      **Control Over Plaintiff's Work**

a.      **The Peer Review Process**

The Defendants claim that Plaintiff exercised discretionary control over the manner and means by which she provided medical services. (Def. Supp. Mem. 15-29.) The Second Circuit, however, found an issue of fact as to control based on Plaintiff's claim that the peer review and QA process went beyond simply monitoring patient outcomes, and directed

---

[6] Plaintiff does not argue in her most recent submission that the <u>Reid</u> factors weigh in  favor of employee status. Rather, she urges this Court to find that the employee/independent contractor finding should be made by a jury. (Pl. Mem. 8/28/09 at 12.) Accordingly, this Court has reviewed Plaintiff's <u>Reid</u> arguments contained in her Memorandum in Opposition to Defendants' Motion for Summary Judgment filed on May 21, 2004. (Docket No. 108.)

specific medical care and treatment by her. Salamon, 514 F.3d at 229.

The Second Circuit acknowledged that at least four other Circuits have explicitly rejected physicians' reliance on similar arguments, finding that hospital peer review programs do not constitute exercises of control over the manner and means of physicians practice as they involve policies that simply reflect professional and governmental regulatory stanards. Id. at 231 (citing Shah v. Deaconess Hosp., 355 F.3d 496, 500 (6th Cir. 2004); Clecek v. Inova Health Sys. Servs., 115 F.3d 256, 262 (4th Cir. 1997); Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 493 (7th Cir. 1996); Diggs v. Harris Hosp.-Methodist, Inc., 847 F.2d 270, 273 (5th Cir. 1988). The Second Circuit distinguished those cases on the ground that OLV's peer review and QA programs went beyond merely reflecting professional governmental regulatory standards, but rather dictated "detailed treatment requirements."  Id. at 230.

Specifically, Plaintiff asserts that OLV did not simply review the quality of her patient treatment outcomes, but mandated performance of certain procedures, the timing of others, directing which medications she should prescribe, and recommending changes to her practice based on their financial impact to the department. For example, Plaintiff states that she was "repeatedly instructed to discharge [her] patients before their treatment could be completed and to perform endoscopic procedures on an outpatient basis to economically benefit the Hospital." (Pl. Aff., ¶¶ 72-13.) Further, she attests that she was required to attend GI Division meetings "where [she] was instructed on how to perform services consistent with OLV's particular manner," and that she was required to follow a GI Division policy mandating the performance of unindicated or "prophylactic" procedures. (Pl. Aff., ¶¶ 74, 78-80.)

The Hospital's review of Plaintiff's practice resulted in a detailed reeducation and mentoring program requiring Plaintiff to be re-trained to perform services at OLV in a particular manner. (Pl. Aff., ¶ 405.) That reeducation requirement controlled specific details of her work at the Hospital, which included: "(a) indications and treatment for EGDs [esophagogastroduodenoscopies]; (b) appropriate treatment of AV [arteriovenous] malformations and removal of polyps found on colonoscopy; (c) use of pH monitoring with esophageal manometry[;] and (d) length of colonoscopy procedures and level of sedation during colonoscopy." (Pl. Aff., ¶¶ 346-347, 406.)  Citing to terms from that reeducation requirement, the Second Circuit concluded that, "'Appropriate treatment,' 'removal,' 'monitoring,' 'length of ... procedures,' and 'level of sedation' are exactly the kinds of 'manner and means' of practice over which employers exert control. That this reeducation ultimately did not occur is beside the point." Salamon, 514 F.3d at 230.

Thus, Defendants urge this Court to find that, upon closer examination, the statutes and regulations require all hospitals, including OLV, to exert some control over the manner and means by which physicians render medical care and treatment by requiring them to establish and maintain standards of care. (Def. Supp. Mem. at 17-20.) Therefore, they argue, to the extent that the Hospital''s QA and peer review process became involved in Plaintiff's practice, such involvement was a function of the mandatory regulatory process, and not evidence that OLV employed Plaintiff because it controlled her practice. The Second Circuit, however, has already rejected this assertion, finding that even the regulations that "come closest to governing aspects of everyday medical practice . . . do not approach the level of performance detail dictated by OLV." See Salamon, 514 F.3d at 231 n.13 (citing 10 N.Y.C.R.R.   § 405.16(c)(2)). Accordingly, this Court disagrees with

14

Defendants' position that the reeducation and mentoring requirement's discussion of appropriate treatment, removal, monitoring, length of procedures, and level of sedation is the necessary consequence of the statutory and regulatory requirements that OLV's QA process ensures that physicians meet the applicable standard of care.

### b.    Freedom of Choice and Non-Exclusivity

It is undisputed that Plaintiff had privileges, and treated patients at Buffalo General Hospital, Mercy Hospital, and had privileges at St. Joseph's Hospital. Defendant asserts that because Plaintiff's arrangement was non-exclusive and that she had the freedom of choice to take any or all of her patients to another competing hospital, this factor outweighs the fact the there is an issue of fact as to whether OLV controlled the manner and means of Plaintiff's practice. (Def. Supp. Mem. 25-29.)

Although the relevant case law supports the Defendants' position, see Shah, 355 F.3d at 500 (independent contractor not required to accept patients referred to him by hospital); Alexander, 101 F.3d at 493 (plaintiff not required to admit patients to the defendant-hospital), Plaintiff disputes the nature of her relationship with OLV as being non-exclusive.

First, Plaintiff contends that she had "almost no" patient contacts at Buffalo General Hospital, "very limited" patient contacts at Mercy Hospital, and never practiced out of St. Joseph's Hospital. (Pl. Aff., ¶¶ 7-8 n. 3.)  Second, many of Plaintiff's new patients were referred to her directly from OLV and she was not permitted to refuse these patients. Third, Plaintiff was required by the Hospital to treat un-referred patients who had been admitted by OLV. (Pl. Aff., ¶ 35.) Finally, Plaintiff was required by OLV to treat many of her patients at OLV using its facilities, equipment, and staff, rather than at other hospitals at which she

15

had privileges. (Pl. Ex. 6 at 29-31.) Based on these assertions, Plaintiff has raised a material issue of fact with regard to whether OLV controlled the assignment of patients and exclusivity, warranting submission of the issue to the jury.

In sum, because there are genuine issues of material fact regarding whether OLV controlled the manner and means of Plaintiff's medical practice, as a matter of law, summary judgment is precluded.

### 2.    Skill Required

Plaintiff's responsibilities included performing surgical procedures and treating GI patients at OLV. Defendants argue that the education, training, and skill required to obtain a medical license for and engage in the practice of medicine indicate independent contractor status. (Def. Supp. Mem. at 33.)

Plaintiff cites to Aymes v. Bonelli, 980 F.2d 857, 862 (2d Cir. 1992), in claiming her skill level supports a finding of employee because the Aymes court lists only "architects, photographers, graphic artists, drafters and . . . computer programers [as] highly-skilled independent contractors." Aymes, 980 F.2d at 862. Plaintiff claims that physicians are not on the list and thus not independent contractors.

While there is no Second Circuit precedent that states that the nature of a physician's occupation ipso facto imposes independent contractor status, there is no indication that the Aymes list was meant to be complete and, further, the Second Circuit has found as independent contractors positions not listed in Aymes. See, e.g., Lee v. Glessing, 51 Fed. Appx. 31, 33 (2d Cir. 2002) (finding that physical therapist had high degree of skill as evidenced by his education, licensure, extensive work history, and ability to perform work without supervision and discretion as to how to treat patients). Indeed,

16

several district and circuit courts, in applying the <u>Reid</u> factors, have held that the level of skill required for physicians generally tips in favor of independent contractor status. <u>See</u> <u>Alexander</u>, 101 F.3d 487 (finding that physician was independent contractor of hospital where he received no paid salary or benefits from hospital, had authority to exercise medical judgment over his practice, was free to associate with other hospitals, and possessed "significant specialized skills"); <u>Diggs</u>, 847 F.2d at 274 (stating that "[a] physician's work involves considerable skill."); <u>Chadha v. Hardin Memorial Hospital</u>, 202 F.3d 267 (6th Cir. 2000) (rejecting discrimination claim where, among other things, plaintiff was "a trained physician with specialized skill in anesthesia and he exercised independent judgment in patient care.") (unpublished opinion); <u>accord</u>, <u>Pamintuan v. Nanticoke Memorial Hosp., Inc.</u>, No. 96-223-SLR, 1997 WL 129338, at *10 (D. Del. 1997) (gynecologist/obstetrician "brought specialized medical skills to the workplace and operated quite independently."); <u>Vakharia v. Little Co. of Mary Hosp. & Health Care Centers</u>, 2 F.Supp.2d 1028 (N.D. Ill.1998) (anesthesiologist possessed specialized skills).

Accordingly, this Court finds that this factor weighs in favor of independent contractor status for Plaintiff.

### 3.    Duration of Relationship between Plaintiff and OLV

Plaintiff had privileges at OLV for nearly ten years, and her tenure with OLV ended when her privileges automatically expired, like those of all medical staff at the Hospital. Thus, Plaintiff concedes that the duration of the parties' relationship is "not significant here and should be disregarded." (Pl. Mem. at 7-8.)

Because this Court has already determined that summary judgment is inappropriate in this case, it need not consider the length of time Plaintiff worked with OLV as a

determinate factor in the <u>Reid</u> analysis.

### 4.      Right to Assign Additional Projects

Plaintiff states that she was required to be "on call" for emergencies and was required to provide services to OLV's patients, and as such, supports her position that she was an employee because OLV exercised its authority to assign her additional projects. (Pl. Mem. at 17.)

Several courts have found that the "on call" requirement does not necessarily create an employer-employee relationship. <u>See, e.g</u>, <u>Alexander</u>, 101 F.3d at 493 (finding that the plaintiff physician's requirement to be "on call" was a product of his position and not sufficient to establish an employer-employee relationship); <u>Vakharia</u>, 2 F.Supp.2d at 1031 (while hospital's "on call" requirement may support status as an employee, standing alone it is insufficient to establish employee status); <u>cf. Cilecek</u>, 115 F.3d at 259 (finding that physician was not an employee for purposes of Title VII, pointing out that plaintiff-physician was not required to be on-call and had autonomy over his scheduling).

Here, Plaintiff admits in her affidavit that the requirement that she be "on call" was a condition of her maintaining staff privileges as set forth in the Hospital's bylaws (Pl. Aff., ¶ 126.) This Court agrees that in this case, Plaintiff's "on call" status was a condition that Plaintiff accepted when she applied for staff privileges, and was not a duty assigned after she obtained her privileges.

This factor, accordingly, does not favor either a finding of employee or non-employee.

### 5.      Plaintiff's Discretion over Hours Worked and Schedule

Defendants argue that Plaintiff had complete autonomy over the hours and times

during which she conducted her medical practice. (Def. Supp. Mem. 40-42.)

Plaintiff, on the other hand, contends that she was "forced" to conduct her medical practice in accordance with a schedule established by OLV. (Pl. Aff., ¶¶ 148-54.) Specifically, Plaintiff avers that she was only allowed to use the endoscopy rooms at certain times based on OLV's scheduling system, and that the GI unit limited scheduling on certain days. According to Plaintiff, OLV had the exclusive authority to transfer her from one schedule of hours or days to another, limit the number of hours she could work, and limit the number of procedures she could perform on a given day. Plaintiff's schedule was also dependent upon the availability of OLV nurses who monitored Plaintiff's work and "without whom [her] work could not be accomplished." (Pl. Aff., ¶ 150.)  Moreover, Plaintiff has submitted evidence that physicians with staff privileges at OLV would have to apply in writing for a leave of absence, which would then be granted or denied by the Hospital. (Pl. Ex. 15 at 59.)

Accordingly, this Court believes there is a dispute as to whether Plaintiff could herself provide her own schedule or whether OLV had control over how her work schedule was set.

### 6.    OLV's Tax, Benefit, and Payroll Treatment of Plaintiff

OLV did not pay Plaintiff a salary, wages, benefits, or any other monetary compensation. She billed patients or their insurers directly for her services, while OLV billed them separately for the corresponding use of its facilities. Additionally, it is undisputed that Plaintiff carried her own professional liability insurance. Thus, as this Court previously observed, these factors "heavily favor a finding of non-employee." (Mem. &

Order 3/8/2006 at 21.)[7]

### 7.    Plaintiff's Role in Hiring and Paying Assistants

Plaintiff started at OLV as a sole practitioner and continued as one throughout her tenure there.  OLV provided her nurses and administrative staff.

The parties seem to agree that the Plaintiff's role in hiring and paying assistants is irrelevant to the analysis in this case because the nature of Plaintiff's work did not require that she hire any assistants, citing to Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111 (2d Cir. 2000), a case involving a female warehouse worker whose duties included moving furniture. (Def. Supp. Mem. at 42-43; Pl. Mem. at 9.) In the physician-hospital context, however, it appears that courts have considered this factor in determining employee status where a hospital provides nursing staff or other assistance. See, e.,g., Alexander, 101 F.3d at 493 (plaintiff was independent contractor despite the fact that he "did not supply his own equipment or assistants"); Shah, 355 F.3d at 500 (finding independent contractor status where hospital did not dictate plaintiff's hours or pay his assistants).

Here, OLV was exclusively responsible for the hiring, supervising, and paying the individuals who assisted Plaintiff in her work. (Pl. Aff., ¶ 142.) When Plaintiff was on-call, she used OLV's nurses and assistants, and, further, her work at OLV was dependent on the availability of those assistants. The Hospital also maintained exclusive authority over

---

[7] The parties did not brief the preliminary question of remuneration, which is an essential condition to Title VII claims. O'Connor v. Davis, 126 F.3d 112, 115-116 (2d Cir. 1997). Thus, this Court assumes for purposes of this motion that the benefits Plaintiff did receive (facility, equipment, and supplies; uniforms and protective equipment; an identification card, parking at the Hospital; staff assistance; and access to OLV Human Resources files) constitutes "indirect economic remuneration" sufficient to establish that Plaintiff was hired by OLV necessary for the application of common-law agencies principles set forth in Reid. Id.

staffing patterns in the GI lab, where Plaintiff performed her work. Moreover, Plaintiff's case is unique because the Hospital directed the GI lab nurses to supervise Plaintiff's work and report to the OLV administration any perceived deviations from standard practice and policy as part of the QA Program that Plaintiff was subject to. (Pl. Aff., ¶ 144-146.)

In this Court's view, this factor is relevant to whether OLV exercised control over Plaintiff's privileges and practice so as to warrant a finding that Plaintiff was an employee of OLV, and Plaintiff has therefore raised a triable issue of fact as to the staffing of her medical assistants.

### 8.    Remaining <u>Reid</u> Factors

It is undisputed that the Hospital provided the location for Plaintiff's medical practice, provided the necessary equipment and supplies for her medical practice, and was in the regular business of providing medical services. Such is the case for most physician-hospital situations. <u>See</u> <u>Cilecek</u>, 115 F.3d at 262 ("that <u>Cilecek</u> used instruments of the hospital emergency room that were supplied by the hospital is also inherent in the provision of emergency medical services and likewise is not a reliable indicator of employee status."); <u>see also</u> <u>Alexander</u>, 101 F.3d  at 493; <u>Diggs</u>, 847 F.3d at 273. Accordingly, the case law does not give significant weight to these factors,  <u>Aymes</u>, 980 F.2d at 863-864, and they are therefore indeterminate as to whether Plaintiff was an independent contractor or an employer of OLV.

Nonetheless, in light of the dispute over the existence and degree of the <u>Reid</u> factors as they apply to Plaintiff's case, Plaintiff's employment status can only be resolved upon trial of the disputed material facts.

**D.    Plaintiff's Remaining State Law Claims**

Since the Second Circuit reversed this Court's grant of summary judgment that disposed of Plaintiff's federal claims, it also vacated the grant of summary judgment on Plaintiff's pendant state claims of tortious interference with business relationships. Salamon, 514 F.3d at 233.

For practical and equitable reasons, this Court will exercise supplemental jurisdiction over Plaintiff's claims of tortious interference with contract and business relations. Those claims will be brought to trial as discovery has concluded, the record is fully developed, and the claims are based on the same body of evidence as Plaintiff's federal claims.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motions are denied. The following issues remain for trial are: (1) Whether Plaintiff was an employee of OLV for purposes of Title VII; and, if so,  (2) Whether Plaintiff was discriminated against and/or harassed by the Defendants in violation of Title VII and NYSHRL; and (3) Whether Defendants tortiously interfered with her contracts and prospective business relations.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motions for Summary Judgment (Docket No. 101, 104, 106, 107) are denied.

FURTHER, the parties shall appear before this Court on May 11, 2012, at 9:00 a.m. for a status conference to set a trial date.

SO ORDERED.

Dated:   March 30, 2012
     Buffalo, New York

                          /s/William M. Skretny
                          WILLIAM M. SKRETNY
                             Chief Judge
                     United States District Court